Good morning, ladies and gentlemen. We have three cases on the docket for today. As I understand it, in the first case, Mr. Margolis, you want to reserve three minutes for rebuttal, is that correct? Yes, Your Honor. Did I pronounce that name correctly? Margolis, Your Honor. Okay. The case is Specialized Bicycle Components v. K.G. Motors, Inc., docket number 151412. It is an appeal from the Patent Trial and Appeal Board. You can begin when you're ready. May it please the Court. Precious Little separated the closest prior art in this case, Okajima 307, from the claims of the patented suit. Okajima 307 had all of the elements of the patent other than specifically calling out the dimension of the sidewall height. But that dimension was available to one of skill in the art. Okajima 766 had a flat bead seat and the claimed dimensions shown in its sidewall. That's the crotchet style rim, right? Yes. I don't know whether it's pronounced crotchet or crochet, Your Honor. I'll go with crochet. Yes. It's a different rim than the rim of the 307, right? It is only to the extent that you look at what's called the standard. The standard is a manual so that tire manufacturers and rim manufacturers can be on the same page. The reason we don't believe that is relevant here is the 307 rim was already outside of the standard. Because this is a market for enthusiasts. While most consumers might want to make sure they're buying a tire and a rim that fits and is relatively standard, we see that people in this area are working outside the preordained standards. In terms of general shape, the 307 and the 766 look very similar, though the 307 is not within the quote unquote standard crochet or crotchet style rim. The board found that this was prima facie obvious, that the claim dimension was within the options to one of skill and the art. What the board did find, however... What we're reviewing, though, is the total determination of obviousness. Correct. We could disagree with the board's finding as it relates to motivation to combine, even if we think that there are some arguments that you've made that are somewhat persuasive on commercial success, right? Yes, Your Honor. We believe that the board was correct in finding prima facie obviousness. We find the board's error to be in its finding of that commercial... I'm sorry. We believe that the board was correct in finding prima facie obviousness. The board was incorrect in finding that the secondary consideration of commercial success outweighed that. We believe there are three errors. With respect to the motivation to combine, though, one of the things that jumps out at me is if it was so obvious to combine the two, then why didn't the inventor and the prior art combine the two? What we don't know is that the inventor didn't do this, and I apologize for the double negative. Okajima 307 shows figures without dimensions in it. We had argued to the board the first time that if they were drawn to scale, it would have been within the dimensions of the patent. The board pointed out, and we don't disagree with the board's finding there, that because it wasn't clearly called out that it was drawn to scale, we can't import those dimensions. That's crazy. Correct. I apologize for the use of that 101, but you know what I mean. We agree totally. But there's no evidence that Okajima 307 did not use those dimensions, and that's why I call it out. If you look at it, there's nothing to say Mr. Okajima. I know, but who's supposed to be? What's the burden here in terms of establishing the motivation to combine? The burden is on us here. To say, well, there's no evidence that he didn't use those dimensions, the real point is that there's no evidence that he did. Correct, and that is what we filled in with the testimony of Mr. Thompson, that these dimensions were out there to one of skill and the art, and that they very easily could have been combined. It was a design choice there. In fact, the shorter sidewall heights are also listed in the standard as possible sidewall heights. So the board, as it is required to do, did look at secondary considerations, and that's where we think they erred. What they found was they... So what did the board do? Did it require that there be a prima facie showing first before consideration of secondary considerations? In the board's decision, it looked at two issues. It first found the prima facie obviousness. That was hotly contested below, and it's somewhat contested here above. They found the prima facie obviousness, and then they did look at the secondary considerations. When they looked at the secondary... Are you aware of Leo Pharmaceuticals? Yes, Your Honor. Where this court said that in order to give the objective indicia of non-obviousness appropriate weight, it's supposed to be considered at the same time the question of motivation to combine is considered and that they're all supposed to inform each other. I have no... I don't believe that the board did it wrong. I'm just reporting how they did it in terms of writing their decision. But you'd agree the idea is that ultimately the board's responsibility was to consider all the evidence taken together in the sense that the prima facie showing of obviousness is just a procedural tool. But then once the rebuttal evidence comes in from the patent owner, in a sense, whatever was that made up the prima facie case in a way dissolves, and then now you've got to reconsider everything anew in light of the rebuttal evidence to make a determination of whether, in fact, one of ordinary skill and the art at the time of the invention would have found these claims obvious. Absolutely. We do not disagree with that at all, that you must look at the totality of the evidence. You can weigh the relative prima facie or engineering-based obviousness with the evidence in the record of secondary considerations, but we don't at all say that the board shouldn't have looked at the secondary considerations or that it's not a primary or at least a primary is a very bad word. It's a very important thing to look at when determining the obviousness of the patent. Getting to the secondary consideration evidence, I guess your concern, would your biggest concern be the fact that there was no market share data presented? Actually, my biggest concern is that what the board looked at for a nexus really does not, even on a surface reading of that evidence, support the nexus. What this court has said is that gross sales are at best a weak indication of commercial success, but it's at least a weak indication of commercial success. Can we begin with a presumption of nexus? You can only begin with the presumption of nexus if it's shown that the commercial product both embodied the claims of the patent and were coextensive. There was never such a finding by the board here. I'm not sure where you get that coextensive requirement. That would... The coextensive in the Brown and Williamson case, that's what this court has said. In numerous cases, the court was looking to... It never imposed a coextensive requirement. In some ways, that would make no sense because there are often additional elements that would simply say that unless you essentially are able to have an anticipation type analysis, that there wouldn't be any presumption, but that's not what our law is. It seems like the only... That would reduce nexus to just maybe for drug patents. Anything that's a non-drug patent could never be truly coextensive with the commercial product. I'll give you three examples from the case law as to what we believe coextensive means from this court. In the DiMacco case, 851 F. 2nd, 1387, it said when the commercial embodiment of the patent is merely a component of what's for sale, it's not coextensive. In MediaTek's licensing, it looked to see if there were other reasons that the embodiment of the patent sold there. It found better manufacturing techniques and celebrity. In the Theracense case, it found that the commercial embodiment was a commercial embodiment of both the patent in suit and another. Therefore, in all three of those cases, did require the additional showing of a nexus. It didn't presume. And the board here didn't presume as well. What the board did was the board looked at... The board didn't apply a presumption, and I don't necessarily agree with you on your presumption analysis, but putting that aside, if you look at all of the evidence the board relied on, I think one of your problems is that it's really not just a pure commercial success. If you look at all of the evidence, the board didn't describe it as such, but there is a huge amount of industry praise that is directly tied to this feature. With all due respect, Your Honor, the board did not find industry praise. That's an independent secondary consideration. Well, when you say they didn't find it, they talked about it, and it is encompassed within a fair reading of what it is the board was looking at. The articles that were there were talking about what was on the market. Some of the articles offered were buyer's guides, and then there were discussions of the various items for sale. The articles, when talking about the KG Motors product, Stamps No Tubes was the commercial name used, talked about those products and its benefits as a wheel set with all the components combined, and was doing it for each year of the evolution of the product. There were many descriptions there. What the board said it was finding, and by pulling snippets of those articles, was using those articles for a nexus. We can disagree whether it is in effect industry praise, but it was not a finding of industry praise. You don't have to have a finding. There's a difference between an alternative ground of rejection and just finding additional support in the record for the actual ground of rejection that the board relied upon, correct? Yes. So if we find that the board's conclusion of non-obviousness was supported, along with other things, by evidence of industry praise that is supported by the record, then we're free to conclude that, correct? I believe as a legal conclusion, under the Chenery Doctrine, this court is not supposed to find facts that were not found below, but because obviousness is, at the end of the day, a legal conclusion, this court can make any legal conclusion. Right. I mean, Chenery says we can't use alternative grounds. So if we were to find that the patent was, or say the board found it invalid on obviousness, we couldn't find it invalid on anticipation or invalid under 112 without sending it back to the board. But we could find support for the board's actual ground of rejection in the evidence of record. Yes. And we believe that support simply isn't there. When read in context and when read in full, and it's only approximately 11 pages of articles and buyer's guides, they don't support the finding of a nexus. Every time the product was part of a wheel set and a design sold to the consumer as a whole. But there were multiple times in those various articles where those reviews zeroed in on the shortening of the sidewall. And then the reviewers, you know, you can find several places where they say, okay, we've got a shorter sidewall here with Stanley Kosyatak's new bicycle rim, and look, we can avoid pinch flats with that. Look, they're lighter and they're stiffer, and now you have more surface area of the tire to contact the road and things like that. The point is, there's all these different aspects, attributes now of these tires that are due to or driven by the shorter sidewalls as identified by the multiple reviewers. And if that's the case, why can't the board reasonably find an inference that all of these improvements in the bicycle rim that flow from the shorter sidewall were the reason why customers were driving up the sales growth for these new bicycle rims? I'll try to reserve one minute for rebuttal, but quickly, in terms of shorter sidewall standing alone, that was indisputably in the prior art. But more importantly, the snippets say, as a fringe benefit, the sidewalls, and then go on to all the other reasons about the sidewalls and pinch flats as one of the articles submitted by patentees showed is an advantage of all tubeless tires, not limited to this one. So read as a whole the articles we believe do not actually provide the nexus, substantial evidence of the nexus. We'll restore two minutes of rebuttal for you. I appreciate that, Your Honor. Because you pretty much used it all up. And to the extent, Mr. Dowd, you need an extra two minutes, we can give that to you, too. But I'm not encouraging you to necessarily use it. Thank you, Your Honor. I don't believe I will need it. Jim Dowd on behalf of the appellee, KG Motors, who I will refer to by their commercial name, No Tubes. The question before the court is whether the board's decision that the 846 claims are not obvious is supported by substantial evidence. And we would submit that on all fronts it is supported by substantial evidence. It wasn't the most fulsome obviousness analysis that I've ever seen. Your Honor, I believe that it was not so fulsome on the Prima Fascia case, but it was what was necessary on the secondary considerations case. And ultimately, I believe it's 17 to 18, the balancing, the weighting of those evidence was complete. And on each of the elements that Specialized has raised, there is substantial evidence in the record to support those elements. So when it comes to commercial success and the success of the product, the first thing I'd like to point out, which is a bit confused when you read the reply brief, is that the data that is presented on the sales is for sale of the rim alone, not for sale of a complete wheel set, not for sale of spokes or hubs. It is exactly the rim. What do these rims go for? The rims vary in price. I think the average price, if you look at the data, is somewhere around $40 for just the rim itself. Some of the higher end ones, like the ZTR Olympic, may be north of $100. But they are rather expensive. And they're for elite athletes. If you look to the articles, you'll see folks like Lance Armstrong named as one of the athletes. How do we know these are commercially successful when all you did was give us sales figures? And we've said time and again, sales figures is not particularly compelling when just given to us in isolation. For at least two reasons, Your Honor. The first is, it wasn't just sales figures. Actually, there are three reasons. It wasn't just sales figures that were given. The first thing that the board said was, these rims are the same as what's claimed. And there's evidence to support that. If you look to Mr. Kosciadek's declaration, I believe it's at A145, he says that the rim itself is the invention. And that's backed up by the engineering schematics for the rims that were actually sold. Were there sales other than these particular rims? How many different lines of rims does No Tubes have? There were only two, Your Honor. There were the pre-invention rims, which are the first-generation rims that are listed in the table at A145. And then there are the inventive rims, which are all the other rims that get sold. So all the figures that we have relate to the inventive rim? Exactly. And the engineering schematics, there's an example at A180. But let's go back. They relate to the inventive rim only because those are the only rims that the company's selling. That's correct. When we say gross sales, really we're talking about gross sales related to that specific rim. It is sales volumes of the specific rim that practices the invention. And you can see that by comparing the engineering schematic of the rim at A180 to Figure 2 of the claim. The board did that comparison. That's at, I believe, A15. And they said the sales data pertains to the sales of the rims only. And they cite the Kosciatek Declaration Exhibits A through L, which are listed there. Okay, so you've given me one of your three reasons. And the first reason sounded more like a nexus justification, not why this is commercially successful. Well, then briefly, Your Honor, the second reason would be if you look to specialized evidence, Specialized submitted the declaration of Mr. Buckley. And Mr. Buckley actually testified in that declaration that Specialized has realized significant commercial success for its control rim. If you compare the sales of the control rim to the sales of the no-tubes ZTR rim, which is the commercial embodiment, which the board actually does do at A16, what you see is Mr. Buckley says that, and really the question here is, is it commercially significant? Are these sales commercially significant? And what he says is a significant commercial success are sales that are at the level of $1,500 a year, $2,200 a year, $3,376 a year. Right, and then you have sales that are a couple orders of magnitude above that. 37 times greater. But why didn't you give us some market share evidence? I believe the answer to that is that the market for this product was developing and maturing over time, and the data for market share outside of this direct competitive relationship wasn't available to us to provide. However, the third point I would make is that with respect to the argument that... So you're saying that just by comparing the two competitors, you're thinking that that is reflective, essentially, of a market share analysis? It is reflective of the fact that the sales volume is commercially significant, which is what the cases say you're looking to with this market share information. Commercially significant to you is the same thing as commercial success? I'm saying that the commercial success of the product is shown by the volume of sales, and the case law actually... Where have we said that? What have we talked about in market share? Actually, in the Tech Air case, which is cited in our brief, it's 192 F. 3rd, 1353, the court specifically addressed this question and said, quote, sales figures alone are also evidence of commercial success. That's true, and then there have been other times before and since Tech Air where we've said, sales figures alone are weak evidence of commercial success. I think you agree with that, right? We've said that. There are such cases, but the question here is, is the board's finding supported by substantial evidence? The evidence is the sales volume figures which show a rapid growth. They had 43% compound growth over the period that we're looking at. It is the admission from Specialized that sales that are in the thousands are actually a significant commercial success in this specific market between these competitive products. And we have the fact that NoTubes had 37, sometimes as much as 45 times greater sales in the same period. The problem I have with the lack of market share data is that the biking industry has experienced an upward tick, correct, in sales as a whole, the industry. I don't believe that there's evidence in the record to demonstrate that. But the record evidence does demonstrate that these particular products were widely recognized as being commercial success. Let's assume that that's the case. Let's assume that our society has become more health conscious and a lot more people are bicycling from 2004 to 2011, going out and buying bikes and engaging in mountain biking and that type of activity. So you have an expansion of the market. How are we to know that these sales, what the level of these sales are relative to the expanded market? I believe it comes back, Your Honor, to the point that I was making earlier, which is that if you look to what we know of this market, this market contains two products. It's the Specialized Control Rim and the NoTubes ZTR Rim. And if you compare these two products, the sales levels that the ZTR Rim achieved are 37 times greater than Specialized. What you're saying is that the market is not for bike rims. It's for specialized bike rims for high-end athletes. That's correct, Your Honor. This is a sub-market. It's not all rims that we're competing against. These are mountain bike rims that are ridden by elite athletes. Other than the reference to Lance Armstrong and a few other elite athletes, what in the record supports that conclusion? I think the fact that we have these two particular products supports it. I think that the articles which talk about who the riders are, for example, there's an article by I believe it's Single Track Magazine at A681, which talks specifically about these rims. And it says that Mr. Kosciadek is probably one of the most creative, inventive, persistent figures in the mountain bike industry. It says, Before anyone else in the industry even thought to consider the concept, Kosciadek was making rims with short sidewalls and minimal bead hook specifically for tubeless tire setups. The short sidewall and minimal bead hook allows the tire to roll and conform to terrain, plus the bead nests more securely in the small space between the bead hook and the tire bed. And then it goes on to say, Add to these characteristics less rim material, which means less weight, improved resistance to denting. The no tube rim profile makes a lot of sense. And then it identifies all of the riders who are riding these rims. Sabine Spitz, Lance Armstrong, Dave Winus, it continues. The point is, these are elite athletes in this industry and they're sold to those folks who are willing to pay a premium. I do want to... And you don't see me riding on these rims? Is that what you're... Well, I wouldn't... I hope you would. Let me ask you, why did you argue industry praise? I mean, with, you know, Apple out there, it would seem like there's some good language you could rely on for purposes of saying this isn't just commercial success, there's industry praise. And all those documents that you submitted would seem to support a notion of industry praise, but you didn't even argue it. I think industry praise is an alternative grounds that the court could use to affirm the decision below. Responding to the Chenery point, I think Your Honor is correct. There is a case that this court decided that addresses the limits of Chenery. It's Killip versus Office of Personnel Management. 991, F2, 1564, and specifically at 1568-69. The court says that we may, however, where appropriate, affirm the board on grounds other than those relied upon in rendering its decision when upholding the board's decision does not depend on making a determination of fact not previously made by the board. Isn't industry praise, though, a fact finding? Whether there was, in fact, industry praise? Well, the board below, we presented those articles as praise in support of the nexus issue for commercial success. For commercial success. But I guess the point is it was not framed to the board as a separate ground for secondary consideration evidence, nor did the board make an independent fact finding separate from the nexus finding for commercial success that there was, in fact, industry praise with regard to the merits of this claimed invention. Therefore, we do not have a fact finding on industry praise as an additional factor for secondary consideration. Is that correct? I would differ in the analysis only in the sense that although the separate secondary consideration of industry praise wasn't independently presented, necessarily in the course of finding the nexus, they found that the praise of this article supports the, or was specifically for the inventive features of the product. And therefore, there is the factual finding sufficient for this court to rely upon these articles as praise. I don't think that the court needs to get to that point, however, because the nexus finding is supported independently by these articles and is itself a ground to affirm. And so, whether you need to go to the praise as a separate secondary consideration or not, I don't think the court needs to get there. The nexus finding is supported by these articles as well as, I will point out, I'd like to come back to the issue of the nexus being presumed, which I believe Your Honor raised. Did you argue that to the board? We did argue that to the board, Your Honor. The board didn't seem to use it, though. The board, well, what the board found was, and this is at A14, was that the rims correspond to rims having the features recited in Claims 1 and 23. And in the J.T. Eaton case, which is cited in our brief, the articulation of the presumption is very much, as I believe Judge O'Malley articulated it, and that is, when the patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention. Now, that's an alternative ground. You don't need to apply the presumption to affirm the board. Did you say J.T. Eaton? J.T. Eaton, yes, Your Honor. Was that a reexamination case? It was a case, I believe it was a case... It was out of the district court. Out of a district court. Coming out of the district court. Yes, Your Honor. This is coming out of the PTO. It is, but the principle is the same. The principle being that when you apply presumption... In PTO cases, there's a case called In Re Huang, for example,  from the PTO where this court said, at least for that particular case, there's no presumption of nexus under those same circumstances that you would have for an issued patent being litigated in district court. I believe in In Re Huang, you didn't have the same level of evidence if you look to the schematics of the product sold being identical to the figure two that sold as was recognized by the board at A15. And so you didn't have the fact of the sales, the demonstration that the thing sold is exactly the rim, not anything else. It's not a combination with other things. So here you've got both the sales volume and you've got the finding that the rims correspond to the features recited in the claim. That under J.T. Eaton does give rise to a finding of commercial success, a presumption of the nexus to the commercial success. Okay, you're just about out of your time? You want to wrap up? Any last things? If I could just touch one final thing, and that is the suggestion that the 766 patent discloses the flat bead seat that's claimed in the claims of the 846 is not correct. And that can be shown pretty readily by taking a look at the figure that the board below looked at. First, there was no specific finding by the board that the 766 discloses a flat bead seat. Second, if we look to the claim, the claim of the 846 patent requires, it has a specific requirement about what it means to be a flat bead seat, and that is flat with respect to quote, an intersection point with a respective sidewall surface. So that requires you to be flat with respect to the sidewall. In the 766 case, rather. The same also talks about horizontal though as well, right? With respect to the axis of rotation. So you can have a flat with respect to the sidewall. That's the requirement of the flat bead seat. Then there's also horizontal, horizontally disposed with respect to the axis of rotation of the wheel. You can be flat with respect to the sidewall, but not horizontal with respect to the axis of rotation of the wheel. So those are independent requirements of the claim. The 766 does not disclose flat in the sense of the claim of the 846. What it discloses specifically, and what the board pointed to, was inclined surfaces 62B. And at column 7, lines 43 to 45, it specifically says that the inclined surfaces 62B are angled at an angle V of between about three degrees and about 17 degrees relative to the imaginary line L, which would be horizontal and would be also perpendicular to the sidewall. So there is no disclosure in the 766 patent of something that is flat, meaning perpendicular with respect to the sidewall. Is that reflected in figure 6? About Kojima 776? Figure 6? Figure 6 was not discussed below, and figure 6 shows a flat... What figure 6 shows is at 62B you have an inclined surface that is between 3 and 17 degrees relative to the... what is being referred to as the sidewall, which is along the side there, I guess arrow 50 is pointing to that. So, throughout this patent, throughout the 766, inclined surface 62B is not flat with respect to the sidewall. It is inclined. And therefore, the teaching of the 766 patent, this in part gets to the Kojima fashion case, and if you want to... You're way past your time. Okay. Even with your extra two minutes. Thank you, Your Honor. Your Honors, I'd like to focus in my two minutes on the gross sales concept. First, the record shows that there were multiple competitors in this industry. It is from the articles themselves. Velo News on AH62 has the No Tubes product, the Shimano product, and the Spinergy product. AH53 from the New Zealand mountain biker has the No Tubes ETR, the Bontrager, which is a track company in Mavic, and what it says here is you'll get a tubeless ready wheel set, but can count on some or all of the following, lighter weight, increased strength, higher quality components, better durability, and reliability from all of these competitors. We simply don't know what market share. A very interesting comment was made by counsel that they didn't have market share because it was a developing and maturing market. That does suggest that if the market itself as a whole was growing, we do not know that there was commercial success in relation to the market as a whole. It's somewhat incredible that one would not be able to determine market share especially in a niche market. It could be even more difficult if you're measuring an industry or maybe even a sector within an industry as a whole, but not a niche market. I mean, obviously, this isn't just Lance Armstrong buying these rims, right? Isn't it wannabe Lance Armstrong that are also buying the rims? I believe that's the marketing concept to have many people buy all these sorts of  It's not a rim company. Specialized is, by and large, a bicycle company, so it did not have this market share data or else it would have provided it. But you were competing obviously with your product and their product that they came up with first was outselling yours on a scale of 100 to 1,000 sales. Still commercially significant, according to your expert? He thought it was that his sales were successful and he said that in the context of once you removed the patented features, the product was sold even more and at a greater rate. So that was his reference to commercial success. But this is not our market. Our market was primarily bicycles. One last question. You have the parties had a litigation in district court that's settled? Yeah. It was the damages in dispute was in approximately the $60,000 range. Specialized had changed its design, made an offer of judgment specifically stating that no findings have any res judicata effect and made no admissions and it just made more sense not to litigate the dispute. So it was an offer of judgment that was accepted. Okay. Thank you.